IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

F I L E D

APR 1 6 2014

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

RENEE PRYOR,                    )
                               )
          Plaintiff,           )
                               )
     v.                        )     1:13cv1125 (LMB/TRJ)
                               )
UNITED AIRLINES, INC.,         )
                               )
          Defendant.           )

## MEMORANDUM OPINION

This action arises from a number of racially charged incidents at Washington Dulles International Airport ("Dulles"), where Renee Pryor ("Pryor" or "plaintiff") was based as a flight attendant for United Airlines, Inc. ("United" or "defendant"). Plaintiff claims that her employer is liable for racial discrimination and harassment, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Defendant has moved for summary judgment on all counts. For the reasons that follow, defendant's Motion for Summary Judgment will be granted.

### I.   BACKGROUND

Pryor, who is African-American, started working as a flight attendant for United in 1984, eventually transferring to Dulles from San Francisco International Airport sometime in the early 1990s. See Def.'s Mem. of Law in Supp. of Summ. J. ("Def.'s Mem."), Ex. B, at 18, 23. Throughout her employment, United has

maintained an official anti-harassment and anti-discrimination policy.   Until 2009, that policy was known as the Harassment & Discrimination ("H&D") Policy, which forbade all forms of harassment and discrimination in the workplace.  Def.'s Mem, Ex. N, at 107-09, 127-28.  The H&D Policy was made available to employees, and Pryor herself was aware of its existence. Following United's merger with Continental Airlines in 2010, the H&D Policy was replaced by a new written policy known as the Working Together Guidelines ("Guidelines").   Implementation of the Guidelines was a phased process, which was completed sometime in the first half of 2011.  Id. at 109.  Like the H&D Policy, the Guidelines forbade harassment and discrimination, and they also outlined in relatively general language the procedures for responding to employee complaints about such conduct.

As far back as the mid-1990s, and as recently as 2008 or 2009, Pryor recalls receiving questions from unidentified colleagues about rumors circulating among United employees that African-American flight attendants based out of Dulles were moonlighting as prostitutes during layovers in Kuwait.  See Def.'s Mem., Ex. B, at 12-13, 44-54.  Although Pryor never lodged any complaints about the prostitution-related questions, supervisors at United caught wind of the general rumors and

2

investigated them. See Def.'s Mem., Ex. D, at 11-13. Because of their third-hand nature and the lack of details or names attached, it was not possible to substantiate the rumors. Def.'s Mem., Ex. J, at 26-32. The General Manager who oversaw United's flights out of Kuwait had no knowledge of any prostitution activity, nor did supervisors at United's base in Kuwait report any prostitution-related issues or concerns with their employees. Id. In addition, the investigation revealed that the Kuwait hotel with which United had a contract at the time had similarly not experienced any issues or concerns regarding United employees prostituting. Id. There is no evidence in the record of these rumors continuing to circulate after 2009, and Pryor has not been asked about them since 2009 at the latest.

In January 2011, Pryor was reporting directly to Richard Reyes ("Reyes"), one of approximately sixteen front-line supervisors responsible for managing Dulles-based flight attendants. Def.'s Mem., Ex. B, at 60; Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. ("Opp."), Ex. B, at 42-43. Reyes reported to Kirstin Raubitschek, an Assistant Manager who played no role in the events leading to this litigation. Raubitschek reported to Denise Robinson-Palmer ("Robinson-Palmer"), an Operational Manager at Dulles, and Robinson-Palmer in turn

reported to Mary Kay Panos, the Director of Inflight Services for all Untied flights out of Dulles.  The latter two are key players in this litigation.

On January 8, 2011, Pryor discovered in her United mailbox a paper note in the form of a mock "Federal Nigger Hunting License" declaring "open season on all niggers."  A hand-drawn image of a person hanging from a pole or a tree also appeared on one corner of the note, as did the words "this is for you."[1] Def.'s Mem., Ex. B, at 55-57.  Pryor immediately sought out Reyes and showed him the note.  See Opp., Ex. A, at 60.  In response, Reyes told Pryor he was "sorry" but that "there was not much United could do" because no security cameras covered her mailbox, id., which was located in an area at Dulles restricted to United employees.  After Pryor continued to express her concerns, Reyes provided her with an incident form to complete.  Id. at 61.  Reyes also called Panos to inform her of the incident.  Because Panos was out of the office (the incident occurred on a Saturday), she directed Reyes to slip an envelope containing the note under her door so she could address

---

[1] There is confusion in the record regarding the precise appearance and contents of the note.  Although plaintiff insists that it included an image of a person hanging from a noose, the copy in the record bears only the mock license, and individuals who saw the note do not describe the additional drawing.  For purposes of this motion, however, the Court will accept plaintiff's version as true.

it first thing Monday morning.  Def.'s Mem., Ex. D, at 78-79.
Panos further directed Reyes to assure Pryor that United would
investigate the incident, id., which he apparently did by
telling Pryor the note would be sent to Corporate Security and
the Base Manager, see Opp., Ex. A, at 61-67.[2]

On January 10, 2011, Panos found the envelope in her office
upon arriving at work.  She then notified Robinson-Palmer of the
incident and the two of them made copies of the note and
discussed what to do about it.  Panos called Pryor but was
unable to reach her because she was on a five-day assignment to
Moscow.  Def.'s Mem., Ex. D, at 98.  Panos also delegated a
number of investigatory tasks to Robinson-Palmer, including
following up with Pryor.  Id.  Accordingly, on January 11, 2011,
Robinson-Palmer contacted Mike Folan ("Folan"), a member of
United's Corporate Security team, to alert him that a United
employee had received in her Dulles mailbox a note containing
racially motivated threats.  Def.'s Mem., Ex. G, at 148.  By the
end of the week, Robinson-Palmer had also interviewed Pryor,
assuring her that an investigation had been launched in
cooperation with Corporate Security.  Id. at 140-147.  In
addition, Panos contacted United's Legal Department and Human

---

[2] Pryor's position in this litigation is that Reyes did not
approach the incident with adequate seriousness, even though she
fails to articulate what other actions he could or should have
taken.

Resources Department in an effort "to keep everybody apprised . . . about the situation at hand." Def.'s Mem., Ex. D, at 94.

In the weeks that followed, the investigation failed to yield a suspect or even the approximate time at which the note was placed in Pryor's mailbox. See Def.'s Mem., Ex. N, at 130-33. "Brushing" the note for fingerprints was thought to be infeasible given that United did not have ready access to a database against which to compare any prints it found; moreover, the uncertain timeframe meant that any number of people could have handled the note before Pryor found it. Id. Acknowledging the lack of credible leads, Folan instructed Robinson-Palmer to make all of the front-line supervisors aware of the incident and to ask them to report any similar incidents. Def.'s Mem., Ex. G, at 212-17. Robinson-Palmer specifically asked Reyes "to keep an eye on Pryor's mailbox for anything further." Id. The investigation stagnated at the local level, and no efforts were made to contact Pryor again. On February 4, 2011, Folan and Robinson-Palmer discussed the status of the investigation, and Robinson-Palmer informed him that there was nothing new to report. Id. at 140-47. Folan reminded her to have the front-line supervisors continue monitoring the flight attendants' mailboxes. Id. With that, Folan closed the investigation.

6

Apparently at no point did Panos, Robinson-Palmer, or Folan contact Pryor directly to inform her that the investigation had essentially ended.

On February 16, 2011, still in the dark, Pryor called United's Employee Service Center ("ESC") and another employee hotline to inquire as to the status of the investigation and to express her frustration at the lack of progress. See Opp., Ex. A, at 75-80. The United representative with whom she spoke opened a ticket and forwarded it to Alice Zauner ("Zauner"), a Human Resources Manager based at United's headquarters in Chicago. Def.'s Mem., Ex. I, at 28-36. On February 17, 2011, after locating records of Pryor's initial complaint, Zauner placed the first in a series of calls to Folan for purposes of gathering information. See Def.'s Mem., Ex. N, at 48-49. Folan recounted the nature of the incident and the course of the local investigation, ultimately sharing his belief that it was an isolated incident. Id. Zauner placed similar fact-finding calls to Robinson-Palmer and Panos. On February 18, 2011, Zauner called Pryor to introduce herself, to explain that Pryor's complaint had been escalated to the Human Resources Department, and to hear out Pryor's dissatisfaction with the course of events. Id. at 57. Because Pryor was about to depart on assignment, Zauner scheduled a follow-up phone appointment

for February 24, 2011, to further discuss details of the incident and the status of the investigation. Id. In the meantime, Zauner engaged in several conversations with Folan and Robinson-Palmer. Id. at 60.

Zauner failed to reach Pryor at the appointed time and left a number of messages that went unanswered. On February 27, 2011, having not yet spoken to Zauner, Pryor filed a report with the Metropolitan Washington Airports Authority Police Department ("MWAA PD"). Opp., Ex. F, at 24. Pryor finally returned Zauner's calls on March 8, 2011, and the two had an "extremely difficult conversation" owing to Pryor's reluctance to share much information with Zauner. Def.'s Mem., Ex. N, at 60. Pryor eventually revealed that she had not been involved in any altercations with other United employees and had no idea who might be responsible for the note in her mailbox. Id. at 70, 77. When Zauner asked Pryor how she would like to see the incident resolved, Pryor initially deferred but upon reflection indicated that a general email to United employees might be sufficient. Id. at 77. At the conclusion of the call, Zauner explained that the investigation remained active and requested that Pryor contact her if any other relevant information came to light. Id. at 78. The next week Zauner interviewed Reyes and Alex Baretto, another front-line supervisor at Dulles, id. at

8

79, but ultimately could not locate any witnesses to the incident, ascertain a rough timeframe for when the note was placed in Pryor's mailbox, or identify any potential suspects.

Based on these findings, Zauner concluded that the note was an isolated incident. Def.'s Mem., Ex. B, at 128-29. On March 25, 2011, to wind up the investigation, Panos circulated a "must read" email to all United employees at Dulles. Although the email did not delve into specifics, it did reference an "incident" and reminded employees to abide by United's anti-harassment and anti-discrimination policies. Def.'s Mem., Ex. N, at 142-44. Zauner also consulted with Folan regarding Corporate Security's role in preventing future incidents. Id. at 122-23. Finally, on April 20, 2011, Zauner wrote a letter to Pryor explaining the steps that had been taken during the investigation, that it was being closed due to a lack of new information, and that United was unable to determine if a policy violation had occurred because the responsible party could not be identified. Id. at 101-02. On July 4, 2011, MWAA PD likewise suspended its investigation for the same reasons. Opp., Ex. F, at 24. There is no evidence of Pryor or any other Dulles-based employees receiving similar notes for several months, until October 21, 2011, when Pryor discovered a nearly identical note in her Dulles mailbox.

As had the first note, this note purported to be a "Federal Nigger Hunting License," but it did not include an image of a hanged person or other handwritten threats. Def.'s Mem., Ex. B, at 85-86. Understandably upset, Pryor went to the nearest supervisor, Sandra Sales ("Sales"), also an African-American woman, who Pryor alleges largely ignored her. Id. at 86-87. Pryor then sought out Reyes, who looked at the note and immediately called Panos to inform her of the occurrence of a second incident. Id. at 90. Pryor refused to leave the note in Reyes's possession; instead, she took it to the MWAA PD and filed a new report. Id. at 97. One or two days after the incident, Panos called Pryor to discuss the note and to schedule a meeting with George Bellomusto ("Bellomusto"), who at that time was United's Human Resources Manager at Dulles. Id. at 97-98. During their conversation, Pryor pressed Panos on the issue of installing cameras in the mailbox area but was told it had not happened yet because of the excessive cost. Id. at 98.

On October 24, 2011, Pryor called United's ESC to lodge a complaint about the latest note. Id. at 80-81. She heard back from Charles Miller, a member of United's Corporate Security team, who gathered information from Pryor and independently reviewed the report and documents from the first incident. Def.'s Mem., Ex. K, at 56-59. United then assigned the new

10

investigation to Bellomusto. Def.'s Mem., Ex. K, at 4-5. On
October 26, 2011, Bellomusto conducted an extensive interview
with Pryor, who still indicated that she had no idea why she had
received such a note or who might be responsible. Id. at 47-53.
Following the interview, Bellomusto also spoke with Reyes,
Baretto, Sales, Robinson-Palmer, and Panos. Regular mailbox
checks revealed that several other African-American flight
attendants based out of Dulles had received the same note in
their mailboxes around the time that Pryor did. Bellomusto
interviewed most of them during the course of the investigation.

On November 9, 2011, through collaborative efforts with
MWAA PD, United installed two temporary security cameras in the
mailbox area. Id. at 47-51. Because cameras had not been
installed at the time of the incident, the second investigation,
like the first one, foundered for lack of a clear timeframe or
identifiable witnesses or suspects. As a result, on November
15, 2011, Bellomusto submitted an "Investigation Summary Report"
concluding that there were no credible leads and detailing
preventative measures that would be implemented. Id. at 142.
The first such measure was a general email circulated to all
Dulles-based flight attendants encouraging them to report
suspicious behavior in the mailbox area. The other measure,
implemented a few months later, was the installation of

11

permanent video surveillance of the mailbox area.  United also coordinated with MWAA PD to record the fingerprints of all United employees known to have touched the notes in order to narrow the field of potential suspects if subsequent dusting yielded any evidence.  Def.'s Mem., Ex. O, at 35-37.  On December 15, 2011, Bellomusto wrote a letter to Pryor informing her that preventative measures had been taken but that the investigation would be closed due to a lack of new information. Def.'s Mem., Ex. B, at 131-32.

Pryor continues to work for United; however, she has relocated to George Bush Intercontinental Airport in Houston. She has not reported any further race-related incidents, nor is there any evidence in the record of similar incidents occurring at Dulles after the above-described events.

On March 9, 2012, Pryor filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging that United had failed to adequately investigate the prostitution rumors and racist notes, and that this failure constituted unlawful discrimination.  She received a right-to-sue letter a little more than a month later, and on July 24, 2012, timely filed the instant action in the Northern District of Illinois, alleging race and sex discrimination, harassment, and retaliation, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. United moved to dismiss for improper venue pursuant to Fed. R. Civ. P. 12(b)(3) or, in the alternative, moved to transfer the action to the Southern District of Texas or this district pursuant to 28 U.S.C. §§ 1404(a) or 1406(a). The district court granted United's request for a transfer to this district. United thereafter filed a motion to dismiss several counts in the Complaint, which relied on factual allegations not raised before the EEOC. In response, Pryor sought leave to file a First Amended Complaint, which dropped the sex discrimination counts. On October 15, 2013, the Court granted Pryor leave to file the First Amended Complaint and denied United's motion to dismiss the remaining counts.

The First Amended Complaint includes three counts, each of which is premised on the same set of facts described above. Count I alleges that United "engaged in a systemic pattern and practice of unlawful racial discrimination" by virtue of its failure to investigate Pryor's complaints, in violation of 42 U.S.C. § 1981. Count II alleges that United created a hostile work environment based on the speculation regarding the prostitution ring, in violation of 42 U.S.C. § 2000e-2(a). Count III alleges that United also created a hostile work environment based on "a pattern of pervasive and persistent

harassing actions" in the form of the two notes Pryor received. Among other forms of relief, Pryor seeks "general damages . . . in no event in an amount less than the jurisdictional limit" of the Court, similarly unspecified punitive damages, attorneys' fees and costs, and injunctive relief.

## II. DISCUSSION

Defendant has moved for summary judgment on all three counts. Plaintiff has responded to the motion and the parties have argued their positions during a hearing before the Court.

### A. Standard of Review

Summary judgment is appropriate where the record demonstrates "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Accordingly, the question on summary judgment is "whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant[.]" In re Apex Express, 190 F.3d 624, 633 (4th Cir. 1999). To survive a summary judgment motion, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." Thompson Everett, Inc. v. Nat'l

14

Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (citation

omitted).  That means the non-moving party may not rest upon a

"mere scintilla" of evidence, but must instead offer specific

facts showing that there is a genuine issue for trial.  See

Celotex, 477 U.S. at 324; accord Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 252 (1986).

### B. Hostile Work Environment

The claims in Count I (§ 1981) and Counts II-III (Title

VII) rely on the same set of operative facts, which plaintiff

alleges are indicative of a racially hostile work environment.[3]

It is well established that the elements a plaintiff must prove

to prevail on such claims are the same under either § 1981 or

Title VII.  Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184

(4th Cir. 2001) (citing Causey v. Balog, 162 F.3d 795, 801 (4th

Cir. 1998)).

---

[3] The Civil Rights Act of 1866, codified at 42 U.S.C. § 1981(b),
prohibits race discrimination in the making and enforcing of
contracts.  To that end, "making and enforcing" contracts
encompasses the "making, performance, modification and
termination of contracts, and the enjoyment of all benefits,
privileges, terms, and conditions of the contractual
relationship."  Title VII prohibits employers from
"discriminat[ing] against any individual with respect to his
compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, religion, sex, or
national origin."  42 U.S.C. § 2000e-2(a)(1).  The Fourth
Circuit has recognized that workplace harassment alters the
terms and conditions of employment and is therefore actionable
under a "hostile work environment" theory.  Ocheltree v. Scollon
Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003).

A hostile work environment claim is established when an employee has proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).  To survive summary judgment, a plaintiff must demonstrate that a reasonable jury could find that the offending conduct was (1) unwelcome, (2) based on her race, (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) imputable to her employer.  Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir. 2010). Offending conduct will only be imputed to the employer when a plaintiff can demonstrate "some basis for imposing liability," usually in the form of evidence that the employer "knew or should have known about the harassment and failed to take effective action to stop it . . . [by] respond[ing] with remedial action reasonably calculated to end the harassment." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 319 (4th Cir. 2008) (internal quotation marks and citations omitted).  Because Pryor does not allege that any of her supervisors committed the offending conduct, she is not entitled to a presumption of

16

vicarious liability, for which defendant would bear the burden of rebutting through an affirmative defense. See Alford v. Martin & Gass, Inc., No. 1:08cv595, 2009 WL 497581, at *6 (E.D. Va. Feb. 25, 2009) aff'd, 391 F. App'x 296 (4th Cir. 2010).

Defendant does not dispute that the offending conduct, that is, the prostitution rumors and two threatening notes, was both unwelcome and based on plaintiff's race. See Def.'s Reply in Supp. of Mot. for Summ. J. ("Reply") 5. Accordingly, only the third and fourth elements of the hostile work environment claims are at issue.

### 1. Severity or Pervasiveness of the Offending Conduct

The severity or pervasiveness of allegedly harassing or discriminatory conduct must be assessed in view of the totality of the circumstances, including (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating, or merely offensive; and (4) whether the conduct unreasonably interfered with an employee's work performance. Harris, 510 U.S. at 23. A plaintiff must show that she subjectively perceived her workplace environment to be hostile and also that it would be objectively perceived as such by a reasonable person in her position. Id. at 22; Sunbelt Rentals, 521 F.3d at 315. Accordingly, simple teasing, sporadic use of abusive language, offhand comments, and jokes related to protected status do not

17

amount to discriminatory changes in the terms and conditions of employment. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Likewise, general complaints of rude treatment are not sufficient to sustain a hostile work environment claim. See, e.g., Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006).

Applying this standard, there can be no doubt that the prostitution rumors — more precisely, the questions asked of plaintiff about the rumors — were neither severe nor pervasive. Granting that plaintiff was subjectively offended by the questions, the objective component of the standard can only be satisfied by more egregious conduct. See Faragher, 524 U.S. at 788. Plaintiff's factual allegations strongly imply that she was never directly accused of participating in the prostitution ring. Similarly, plaintiff does not allege facts showing that she brought the troubling questions to the attention of her superiors when they recurred in 2008 or 2009, nor were the questions so troubling that they caused her to stop working. Cf. Johnson v. United Airlines, Inc., No. 1:13cv113, 2013 WL 3990789, at *5 (E.D. Va. Aug. 2, 2013) ("[T]he prostitution ring rumors, and questions/insinuations in connection with the rumors, do not amount to an abusive work environment."). Even if the questions had been direct accusations against plaintiff which she reported to her supervisors, they would not have been

sufficiently pervasive to support a claim given their relative lack of severity. <u>See</u> <u>id.</u>  That is, plaintiff must allege more than two instances of prostitution-related questions, separated by more than a decade, both of which were mere offensive utterances rather than physical threats, and neither of which substantially interfered with her work performance. <u>See</u> <u>Harris</u>, 510 U.S. at 23.  It is not enough that the questions "engender[ed]" in her offensive feelings. <u>See</u> <u>id.</u> at 21.  The lack of any counterarguments in her Opposition indicates that plaintiff has conceded this point.

Whether the two threatening notes satisfy the severe-or-pervasive standard is a much closer call.  On the one hand, courts have properly recognized that the word "nigger" is "pure anathema" to African-Americans. <u>Spriggs</u>, 242 F.3d at 185.  Use of that word is the kind of insult that can create an abusive working environment in an instant, <u>see</u> <u>Rodgers v. Western-Southern Life Ins. Co.</u>, 12 F.3d 668, 675 (7th Cir. 1993), and is degrading and humiliating in the extreme, <u>see</u> <u>Walker v. Thompson</u>, 214 F.3d 615, 626 (5th Cir. 2000).  Plaintiff therefore argues that the "extraordinarily severe" language of the two notes placed in her mailbox adequately offsets the fact that such conduct was not comparatively pervasive.  Opp. 10-11. On the other hand, courts have also held that only "a steady

19

barrage of opprobrious racial comments," including comments couched in language of the nature used here, meets the severe-or-pervasive standard, rather than "a few isolated incidents of racial enmity" or "sporadic racial slurs." Roberts v. Fairfax Cnty. Pub. Sch., 858 F. Supp. 2d 605, 611 (E.D. Va. 2012) (internal quotation marks and citation omitted). These courts require proof that "the use of racial epithets so pervaded the work environment that it was essentially transformed into an atmosphere tinged with racial hostility" sufficient to alter the conditions of employment. Id. On this basis, defendant argues that two isolated incidents, regardless of their severity, are not numerous enough to constitute the required "barrage." Def.'s Mem. 18.

On the facts presented by plaintiff, including the assumption that the first note had a hand-drawn image of a lynching, a reasonable jury could find that the notes were sufficiently severe to alter the conditions of plaintiff's employment even though they were not pervasive. Contrary to defendant's categorical assertion that plaintiff must have endured more than two instances of racial enmity, "[t]here is no bright line test for the number of times a supervisor or employer can use a racial slur while addressing an employee without creating a hostile work environment for Title VII

20

purposes." Roberts, 858 F. Supp. 2d at 610. After all, the standard is "severe or pervasive" — phrased in the disjunctive — indicating that offending conduct must be assessed along a spectrum where severity and pervasiveness are to some degree inversely related. In this vein, the Fourth Circuit has held that even a single incident may be "severe enough to be actionable in and of [itself]" under a hostile work environment theory. See Okoli v. City of Baltimore, 648 F.3d 216, 221 & n.5 (4th Cir. 2011) (collecting cases). Here, the notes plaintiff received are made extremely severe, and therefore actionable irrespective of their frequency, by virtue of the presence of a clear element of violence. The notes were "physically threatening" rather than "mere[ly] offensive" due to their form as a hunting license, which clearly implicates the express purpose of killing, the additional implication that the recipient is a sub-human object to be hunted, and the allusion to lynching. See Harris, 510 U.S. at 23. Given the sordid history of race relations in this country, a reasonable jury could find that plaintiff was justified in fearing for her safety and altering her habits to avoid any possible confrontations with her anonymous harasser. In other words, the Court concludes that a reasonable jury could properly construe

the notes as racially-tinged death threats so severe that it does not matter that they were not pervasive.

As defendant argues, this conclusion cuts against two recent decisions which appear to take a narrow approach to actionable conduct. In Roberts v. Fairfax County Public Schools, 858 F. Supp. 2d 605, 611 (E.D. Va. 2012), a plaintiff who allegedly endured two racial epithets, one of which was undeniably violent ("I am going to kill you nigger"), was found not to have stated a claim under Title VII because "such limited used of a racial slur [was] insufficient to permeate" her work environment. Id. Although Roberts is difficult to distinguish on the facts, it is clear that the plaintiff's credibility was seriously in doubt, even if that was not a dispositive factor. United also cites Johnson v. United Airlines, Inc., No. 1:13cv113, 2013 WL 3990789 (E.D. Va. Aug. 2, 2013), a sort of companion case to Pryor's, in which two Dulles-based colleagues sued on the basis of the same underlying facts. Although the court granted summary judgment in favor of the defendant upon concluding that those flight attendants had not proved a hostile work environment, the court's decision turned in large measure on a finding that "[n]either [one of them] received the Hunting License . . . or viewed it personally." Id. at *4. That is a significant distinguishing factor from the facts presented by

plaintiff in this case. Ultimately, neither decision forecloses the Court's conclusion here.

### 2. Employer's Liability

Having found that plaintiff has satisfied the severe-or-pervasive standard with respect to the two notes in her mailbox, the final question is whether defendant is legally responsible for any harm they may have caused. It is beyond dispute that employers cannot automatically be held liable for acts of harassment in the workplace. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 72 (1986). Instead, there must be some basis in law for imputing the offending conduct to the employer. This is especially difficult where, as here, the conduct occurred outside the realm of tangible employment actions. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 751, 753-54 (1998). In such circumstances, an affirmative defense is available to an employer, allowing it to escape liability by proving that (1) it "exercised reasonable care to prevent and correct promptly any harassing behavior" and (2) that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 765; Faragher, 524 U.S. at 807. Moreover, where the harassing party is not a supervisor (or not identifiable at all), it is the plaintiff who must prove that the defendant "knew or should have known about the

harassment and failed to take effective action to stop it . . .
[by] respond[ing] with remedial action reasonably calculated to
end the harassment." Sunbelt Rentals, 521 F.3d at 319 (internal
quotation marks and citations omitted).

Defendant argues that its investigation and remedial
actions in response to plaintiff's concerns about the two notes
were more than satisfactory. Def.'s Mem. 23-25. Defendant
emphasizes the measures taken by Robinson-Palmer, Panos, Folan,
and Zauner in response to the first note, which included a
thorough investigation at two levels followed by a "must read"
email sent to all Dulles-based United employees. As to the
second note, defendant points out that Bellomustro and Miller
responded by again investigating the source of the note, sending
an email to Dulles-based employees, and installing permanent
surveillance cameras. Plaintiff counters that defendant is
liable because its supervisory employees failed to follow
internal policies and procedures throughout the relevant
timeframe, which allowed two notes to be sent to plaintiff even
after defendant had notice that one of its employees was
producing racist materials. Opp. 14-18. Specifically,
plaintiff argues that Robinson-Palmer and Panos were obligated
to immediately escalate plaintiff's concerns about the first
note to ESC given their responsibilities under United's H&D

Policy and their knowledge of another racially charged incident at Dulles that occurred sometime in 2010.[4]  Id.  The 2010 incident involved two fliers purportedly seeking a roommate that were altered with a handwritten caveat stating "no niggers need apply."  See Def.'s Mem., Ex. B, 129-31, 150-51.  The fliers appeared a short time apart on a bulletin board in the employee lounge at Dulles.  Although Plaintiff did not personally view the fliers, she argues that she would not have received the notes in her mailbox but for defendant's failure to adequately investigate the fliers.  See Opp. 19, 22.

Defendant has the better argument based on the record.  As to the fliers, the record shows that Robinson-Palmer immediately removed them, called the telephone number listed thereon and spoke to a woman who denied any knowledge of the racist language, and then monitored the bulletin board closely to ensure that they did not return.  Def.'s Mem., Ex. G, at 153-58, 160.  Her actions were sufficient to prevent the fliers from reappearing.  When plaintiff received the first note several months later, it is undisputed that Robinson-Palmer and Panos took the threat seriously and promptly involved United's Corporate Security.  Robinson-Palmer also interviewed plaintiff,

---

[4] The allegations regarding the 2010 incident were not raised in plaintiff's First Amended Complaint.  Instead, they appear for the first time in plaintiff's Opposition to defendant's Motion for Summary Judgment.

informed her that an investigation had been launched, and began
monitoring the flight attendants' mailboxes for suspicious
activity. After plaintiff called ESC to express her frustration
with the lack of progress, Zauner began investigating the
incident personally, which entailed significant fact-finding
efforts and another interview with plaintiff. The record shows
that Zauner's investigation was diligent and that she spoke with
all of the relevant parties. Defendant cannot be held liable
simply because its investigative efforts failed to identify the
responsible party. See Sunbelt Rentals, 521 F.3d at 319
(holding that the applicable standard is whether the
investigation was reasonably calculated to curtail similar
offending conduct). After all, even the MWAA PD, a professional
law enforcement agency armed with information that plaintiff
chose not to share with her supervisors at United,[5] could not
track down the responsible party.

Nor can defendant be held liable simply because its
supervisory employees did not follow internal policies and
procedures to a "T." The law does not prescribe an "exhaustive

---

[5] When asked by Zauner and Bellomustro whether plaintiff had any
idea who might have sent the notes, she consistently answered in
the negative, see e.g., Def.'s Mem., Ex. N, at 70, 77; however,
the record reveals that she had voluntarily provided the MWAA PD
with information about two "persons of interest" in March 2011,
both of whom were United employees, see Pl.'s Mem., Ex. F, at
34, 37.

list" or "particular combination" of measures that an employer
must take in response to an employee's complaint.  EEOC v.
Central Wholesalers, Inc., 573 F.3d 167, 178 (4th Cir. 2009).
And even if it did, plaintiff misstates the record to the extent
she suggests immediate escalation to ESC was the only route
available to Robinson-Palmer and Panos.  United's H&D Policy
clearly indicated that involving Corporate Security was an
acceptable alternative route.  See Def.'s Mem., Ex. C, at 7;
id., Ex. D, at 35.  More significantly, there is absolutely no
basis in the record to conclude that plaintiff's preferred route
would have led defendant to the culprit.  The facts therefore
compel the conclusion that defendant conducted an investigation
reasonably well calculated to stop the offending conduct.
Accord Johnson, 2013 WL 3990789, at *4 ("United took practical
measures in response to each complaint and their investigations
were timely, thorough, and ultimately caused the offending
postings and distribution materials to cease.").  This
conclusion is especially true with respect to the investigation
of the second note, led by Bellomustro, which plaintiff does not
even bother to challenge in her Opposition.  Requiring anything
more of defendant would exceed the burden imposed by the law.

     Plaintiff's secondary contention that defendant failed to
take appropriate remedial action in light of the 2010 incident

involving racist fliers is no more convincing. The 2010 incident has minimal legal relevance, as plaintiff admits that she never viewed the fliers herself, see Def.'s Mem., Ex. B, 129-31, 150-51, and did not allege in her First Amended Complaint that they contributed to the hostile work environment. Moreover, defendant did take remedial action by removing the fliers and continually monitoring the bulletin board. After 2010 no other racially charged writings appeared in the employee lounge. Defendant's remedial actions as to the two notes were similarly appropriate. Defendant investigated the first note, concluded that it was an isolated incident, but nevertheless sent an email to all Dulles-based employees reminding them to abide by United's anti-harassment and anti-discrimination policies. For several months thereafter no incidents were reported. When the second note showed up in plaintiff's mailbox, pointing to a pattern of troubling conduct, defendant permanently installed security cameras, and no further incidents have been reported since that time.

Because the measures defendant took were reasonable and did in fact end the offending conduct, Faragher, 524 U.S. at 807; Sunbelt Rentals, 521 F.3d at 319, defendant cannot be held liable.

### III.   CONCLUSION

For these reasons, defendant's Motion for Summary Judgment will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this _16th_ day of April, 2014.

Alexandria, Virginia

_____ /s/

Leonie M. Brinkema
United States District Judge

29